# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) |
| | )   2:10-cr-00019 |
| | ) |
| DAVID MATHIS, | ) |
| | ) |
| Defendant. | ) |

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Defendant David Mathis's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 359) ("Motion"). The Judge previously assigned to this case, Judge Donetta W. Ambrose, sentenced Mr. Mathis on October 26, 2011. (ECF No. 158.) Mr. Mathis is currently serving a term of imprisonment of 300 months followed by a five-year term of supervised release. (*Id.*) His anticipated date of release from Bureau of Prisons ("BOP") custody is May 8, 2031. Notably, the sentence imposed was an agreed upon sentence via a written plea agreement between Mr. Mathis and the United States governed by the provisions of Fed. R. Crim. P. 11(c)(1)(C).

Based on the record before the Court, the Court concludes that Mr. Mathis has not demonstrated extraordinary and compelling reasons for this Court to reduce his sentence, and that in any event, the application of the sentencing factors of 18 U.S.C. § 3553(a) does not support a reduction in his sentence. Thus, the Court DENIES Mr. Mathis's Motion to Reduce Sentence (ECF No. 359) without prejudice to its reassertion should circumstances later warrant.

1

I.      **BACKGROUND**

Mr. Mathis is no stranger to serious and violent criminal conduct nor to the federal justice system. Between April and July 1994, Mr. Mathis committed a series of five (5) bank/credit union armed robberies. (ECF No. 137, at 8.)  During those robberies he engaged in an array of violent and threatening conduct. He told tellers that he would shoot them or even kill them, including putting the barrel of a pistol to the head of a teller (who he had dragged out of her chair by the hair) who was not complying quickly enough for his liking, threatening to kill her upon his count of "15" if other employees did not give Mr. Mathis the money he demanded; he fired his gun into the air or into the ceiling during several of the robberies. (*Id.*) In each of these robberies, he pointed a gun at one or more tellers, or placed a gun against their head, threatening to kill them if they did not give him the money he demanded within time limits he set, ranging from 20 to 50 seconds.

The worker's compensation claims paid out to the teller/victims of Mr. Mathis's conduct totaled more than $200,000. On February 22, 1995, Mr. Mathis was convicted by his guilty plea of the crime of armed bank robbery and using a firearm during and in relation to a crime of violence. (ECF No. 333.) Mr. Mathis was then sentenced to a total of slightly over fifteen years in federal prison to be followed by a term of supervised release. Mr. Mathis left federal prison in February 2009 on a term of supervised release. He thereafter continued a relationship he had developed in prison with a fellow federal prisoner, Lamont LaPrade.

Mr. Mathis pled guilty to the offense for which he is currently serving his sentence, specifically of knowingly using and carrying a firearm during and in relation to a crime of violence, here, armed robbery in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (ECF Nos. 137, 333.)

Here's what happened in this case, as summarized in detail in the Government's responsive filing (based on Mr. Mathis's change of plea hearing record) and in the Second Revised

Presence Report. (ECF Nos. 137, 363.) In January 2010, Mr. Mathis travelled to the Westmoreland Community Federal Credit Union in Hempfield Township, Pennsylvania with Lamont LaPrade in order to rob it. They were both armed with guns. Upon arrival, things began by Mr. Mathis firing one round from a nine-millimeter semi-automatic pistol, striking a bank teller in the chest. (ECF No. 333, at 22.) Mr. Mathis then fired another round into the wall of the credit union (aiming in the direction of a second teller station) while yelling for the tellers to open the drawers and give him money. (*Id.*) When a teller was attempting to open the vault for Mr. Mathis, he struck a different teller in the head with his gun. (ECF No. 137, at 5.) While attempting to flee, Mr. Mathis fired two more rounds from the handgun in the direction of a patron trying to drive into the credit union's parking lot, while Mr. LaPrade fired one round from a .45 caliber handgun in the same direction. (ECF No. 333, at 23.) Police apprehended Mr. Mathis the next day at a nearby shopping mall. (*Id.* at 24.)

It is also important to consider for these purposes that this latest armed robbery was no spur of the moment undertaking by Mr. Mathis. The record reveals that Mr. Mathis and Mr. LaPrade engaged in intricate planning to execute and then (they hoped) escape with their ill-gotten gains. Mr. Mathis compiled a list of ripe credit union targets for robbery in the Westmoreland County, Pennsylvania area. He and Mr. LaPrade roomed at a local motel in preparation for the robbery, and from there went shopping to acquire the clothes they would use for the robbery, including ski masks and a laundry bag, along with gloves, sweatshirts, and new pants. They changed into their "robbery clothes" before heading to the target of their plan.

During flight, Mr. Mathis used his gun to enlist the aid of a citizen who was shoveling snow from his driveway. That civilian's wife provided Mr. Mathis with new clothes and shoes, and Mr. Mathis was given a lift to a local shopping mall, where he was apprehended by an off-

duty state trooper. That led to this most recent federal prosecution and the sentence which underlies this Motion.

Mr. Mathis faced federal charges of bank robbery, armed bank robbery, conspiracy to commit bank robbery, and unlawful possession of a firearm while committing a crime of violence, this last charge (Count 5 of the Indictment) alleging a violation of 18 U.S.C. § 924(c)(1)(A)(iii). Mr. Mathis pled guilty to that charge of violating 18 U.S.C. § 924(c)(1)(A)(iii), which itself carried a mandatory minimum sentence of twenty-five (25) years in prison, the sentence which he received pursuant to the binding plea agreement he entered into with the United States. He did not plead guilty to the other charges. This was his second conviction under Section 924(c). (ECF No. 137, at 3–4.)

On June 14, 2022, Mr. Mathis filed the pending (and renewed) *pro se* Motion for Release/Reduced Sentence pursuant to CARES and/or First Step Act. (ECF No. 359.) In this Motion, Mr. Mathis requests that after he has served two-hundred-and-fifty-two (252) months in BOP custody, he be permitted to serve the last forty-eight (48) months of his imposed sentence on a special term of supervised release. (ECF No. 359, at 5.) This matter is now ripe for decision.

## II.    LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *Dillon v. United States*, 560 U.S. 817, 819 (2010) (citing 18 U.S.C. § 3582(c)). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that statute allows a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." *Id.* § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate

administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they apply; and (3) whether such a reduction is consistent with applicable U.S. Sentencing Commission policy statements. § 3582(c)(1)(A).

### III.    DISCUSSION[1]

After analyzing the record, the Court concludes that Mr. Mathis has administratively exhausted his request to the Bureau of Prisons ("BOP") for a sentence reduction. The Court also concludes that Mr. Mathis has not demonstrated extraordinary and compelling reasons for this Court to reduce his sentence, and that in any event, consideration of the sentencing factors set out in 18 U.S.C. § 3553(a) does not support the relief he now seeks.

### A.    Administrative Exhaustion

The Court first considers whether Mr. Mathis has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c)(1)(A), a defendant must file an administrative request for release or a sentence reduction with the warden of the facility where the defendant is incarcerated; the defendant must then either (1) "fully exhaust[] all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf" or (2) wait 30 days from the date on which the defendant filed an administrative request with the warden. *Id.* § 3582(c)(1)(A). Either option for the administrative exhaustion under §

---

[1] Mr. Mathis recently made a supplemental filing seemingly calling into question in that filing aspects of one or more restitution orders applicable to him and, shared with the Court his perspective on *United States v. Norwood*, 49 F.4th 189 (3d Cir. 2022). (ECF No. 398.) Based on the holding in *Norwood* that the Ex Post Facto Clause prevents the Government from enforcing a lien on a defendant's expired restitution using the Mandatory Victims Restitution Act, a law not in place at the time of the conduct here, Mr. Mathis argues that his restitution obligation should be reduced by $97,718.70. (ECF No. 398.) However, it is not at all obvious to the Court that a challenge to Mr. Mathis's restitution has anything to do with his Motion for Compassionate Release nor is it self-evident that Mr. Mathis's rather convoluted mathematical computations support his argument. In any event, this Motion is not the vehicle to contest his restitution liability. *See United States v. Wolff*, No. 97-CR-125-JPS, 2021 WL 293681, at *2 (E.D. Wis. July 13, 2021) (stating that a § 3582(c) motion does not authorize amendments to or relief from restitution).

3582(c)(1)(A), standing alone is sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020). Administrative exhaustion is mandatory, and a court may not modify a sentence under § 3582(c)(1)(A) if exhaustion has not occurred, regardless of whether the Government contests the defendant's asserted exhaustion. *United States v. Davidson*, No. 16-139-2, 2020 WL 4877255, at *5 & n.4 (W.D. Pa. Aug. 20, 2020) (citing *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)).

In *United States v. Davidson*, this Court analyzed the requirements under § 3582(c)(1)(A) as to the content of a defendant's administrative request to the BOP compared to the content of the defendant's motion to a court and the resulting scope of a court's review of the motion, including "whether a defendant must specifically mention . . . in a BOP administrative request for compassionate release" each issue the defendant raises with the court before the court can consider those issues. *See id.* at *7–13. The situation before the Court in *Davidson*, and the cases that the Court reviewed in its analysis there, involved a defendant seeking compassionate release in a request to the BOP based on one or more of the defendant's medical conditions and, in the motion to the court, relying upon those same medical conditions while also asserting for the first time that the COVID-19 pandemic constituted an extraordinary and compelling reason for compassionate release. *See id.* at *2–4, *8–13. This Court rejected the "'mirror image' approach" that some courts had taken to such motions that allows a court to "only consider the *exact information* that the defendant put before the BOP via their administrative request"; instead, the Court "agree[d] with the reasoning of [another] line of cases" that had concluded that a reference to COVID-19 made for the first time in the motion to the court "serves to supplement [] core concerns" related to medical issues and "is not an attempt to bring an entirely new request for compassionate release." *Id.* at *8, *14. So long as the record before a court demonstrates that "the BOP [had] the first

opportunity to consider" the primary grounds upon which a defendant relies in a compassionate release or sentence reduction motion to the court and that "such consideration in fact occurred by and within the BOP, the purposes of exhaustion have been fulfilled." *Id.* at *13.

The record here shows that on May 5, 2022, Mr. Mathis submitted a request to a BOP staff member at FCI Herlong asking the BOP to file a motion for compassionate release/reduction in sentence on his behalf. (ECF No. 359-2, at 2, 5.) Mr. Mathis did not submit to the Court a response from a BOP staff member; however, he filed this Motion on June 14, 2022, which was more than thirty days after his internal request to the BOP, so he meets the second option under § 3582(c)(1)(A) for exhaustion. The Government does not present any objections to Mr. Mathis's administrative exhaustion in its response brief. (ECF No. 363.)

Upon the Court's independent consideration of whether administrative exhaustion has occurred, which it must perform regardless of whether the parties agree that Mr. Mathis has exhausted, the Court concludes that Mr. Mathis has met the administrative exhaustion requirement procedurally and substantively as he asserted the same extraordinary and compelling circumstances in his letter to the BOP as he now does to this Court.

### B.  **"Extraordinary and Compelling Reasons"**

Next, the Court must determine whether any of Mr. Mathis's numerous asserted reasons for a sentence reduction—(1) "Institutionalized Childhood and Sexual Abuse," (2) "Charitable and Volunteer Work," (3) "History of Acceptance of Responsibility," (4) "Military Service," (5) "LaPrade's False Statements," (6) "Aggravated Assault by State Law Enforcement Authorities," (7) "Systemic Inequality," (8) "Long-Term Health Issues," (9) "Exceptional Performance in Prison," (10) "Withholding of First Step Act Credits," or (11) "Conditions of Confinement"—

considered separately or in conjunction with one another are extraordinary and compelling such that a sentence reduction may be warranted. (ECF No. 367, at 4–23.)

The Court notes that many of the matters Mr. Mathis now puts before the Court via this Motion were available to and/or presented to Judge Ambrose at the time of his most recent sentencing via his sentencing memorandum. These include Mr. Mathis's history of an abusive relationship between and with his parents, his active duty and reserve military service, his volunteer work in the community, his efforts at self-improvement via college studies before prison and while incarcerated, his gainful employment in the health care field, his educational efforts and successes while in BOP custody and his volunteer service while in that custody, his book authorship, his employment after his first robbery sentence, and his difficult living arrangements during that time. (ECF No. 126.)

While this Court is not precluded from considering these matters in the context of the pending Motion, the Court also does not view a Motion for Compassionate Release as a vehicle for the generalized reassertion and re-litigation of sentencing factors that were either available to be presented to or which were presented to the Court at the time of sentencing by Judge Ambrose, absent some newer circumstances that would and do fundamentally alter their impact on the sentencing equation. *See United States v. Roney*, 833 F. App'x 850, 854 (2d Cir. 2020); *United States v. Sanders*, No. 16-0033, 2022 WL 1104967, at *5 (D.N.J. Apr. 13, 2022). In short, this Court does not believe that the compassionate release process is to be treated as a generalized opportunity for a sentencing "do over" before a newly assigned judge. Given its focus on the presence (or not) of "extraordinary and compelling" circumstances that exist as of the time a motion for compassionate release is filed, there is statutory and logical support for this view.

Section 3582 does not define the phrase "extraordinary and compelling reasons." *See* 18 U.S.C. § 3582(c)(1)(A)(i). Instead, Congress delegated that task to the U.S. Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for a sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling reasons" under the pre-First Step Act version of § 3582(c)(1)(A)(i) in a policy statement contained in § 1B1.13 of the U.S. Sentencing Guidelines Manual, relating to the BOP's discretion to reduce a prisoner's term of imprisonment. However, the Sentencing Commission has not issued an updated policy statement since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. 2020).

In *United States v. Andrews*, the Third Circuit explained that given the lack of an updated applicable Sentencing Commission policy statement defining "extraordinary and compelling reasons," "the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions" for compassionate release. 12 F.4th 255, 259 (3d Cir. 2021). However, "although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons." *Id.* at 260. This is because "Congress legislates against the backdrop of existing law," and thus, by "reenact[ing] the compassionate-release statute without any alterations to the phrase 'extraordinary and compelling reasons,'" Congress likely intended the phrase to retain the meaning that the Sentencing Commission gave it in its pre-First Step Act policy statement. *Id.* Therefore, in reviewing this Motion, this Court does not treat U.S.S.G. § 1B1.13 and the accompanying application notes as "an ultimate binding authority," but the Court nonetheless considers them as a guide in its analysis. *Id.*

9

With these principles in mind, the Court turns to Mr. Mathis's asserted extraordinary and compelling reasons for a sentence reduction.

### 1.  Institutionalized Childhood and Sexual Abuse

Mr. Mathis explains in his Motion that at various times between the ages of four (4) and eighteen (18), he was institutionalized in state protective custody facilities and foster care. (ECF No. 359, at 20.) He details the experiences he endured at a young age including abandonment by his mother, unaddressed emotional trauma, and sexual assault while at camp. (*Id.* at 20–25.) However, Mr. Mathis failed to disclose this information to his attorney or the U.S. Probation Office at the time of his plea or before sentencing. (*Id.* at 24–25.) Mr. Mathis apparently did tell his lawyer about the generally abusive nature of his parents as he was growing up, and that information was put before the sentencing judge in the Presentence Report and defense counsel's sentencing memorandum when Judge Ambrose was considering imposing and then imposed exactly the sentence that Mr. Mathis agreed to via his plea agreement.

Mr. Mathis states his belief that the traumatic nature of his upbringing constitutes an extraordinary and compelling reason for sentence reduction. (ECF No. 367, at 6.) Mr. Mathis takes the position that it does not matter that his abuse occurred many, many years before he committed the crimes of conviction. (ECF No. 367, at 4.) And he points to the comments to U.S.S.G. § 1B1.13 which state that "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction." (ECF No. 367, at 5–6); U.S.S.G. § 1B1.13, cmt 2. The Court acknowledges that guidance, but also believes that it must be considered in the context of both the information that Mr. Mathis had to present to the sentencing judge, did present to the sentencing judge and the reality that the sentence imposed was the sentence that Mr. Mathis agreed to in his binding plea agreement.

The Government accurately acknowledges that other courts have considered a defendant's difficult and abusive upbringing when deciding compassionate release motions. (ECF No. 363, at 9.) However, the Government further asserts that because Mr. Mathis was almost fifty (50) years old when he committed his *sixth* bank robbery decades after the alleged childhood abuse, the Court should not consider the experiences he describes from his childhood when deciding on the instant Motion. (*Id.*)

This Court acknowledges the asserted hardship that Mr. Mathis endured as a child. However, the Court concludes that Mr. Mathis's claimed institutionalized childhood and episodes of sexual abuse do not constitute extraordinary and compelling reasons now warranting a reduction of sentence. Mr. Mathis points to *United States v. Ramsay*, 538 F. Supp. 3d 407 (S.D.N.Y. 2021) for support. (ECF No. 359, at 25.) However, in *Ramsay*, the defendant was granted compassionate release because the defendant was an adolescent at the time of the crime and the court determined that the crime committed had all the characteristics of a crime done by an adolescent (*i.e.* a split-second, hot-headed choice done in the company of peers). 538 F. Supp. 3d at 424. In contrast, Mr. Mathis was a quite mature and highly educated adult with the perspective that comes with military service when he committed his crime of conviction and, as the record shows, his robbing the credit union was not a split-second decision, nor has its commission been demonstrably connected to his asserted childhood trauma.

The Court is not precluded from considering information that was available to the sentencing court when the involved sentence was imposed, but given the long period of time between the childhood trauma Mr. Mathis now relies on and the violent crimes of which he was convicted, Mr. Mathis's failure to bring these matters to the sentencing court's attention (and especially the absence of  a sufficient evidentiary basis for connecting one to the other to

demonstrate the tangible impact of those childhood events on Mr. Mathis's criminal conduct) is telling. The Court is not convinced that this factor considered in isolation or in conjunction with the other grounds advanced constitute "extraordinary and compelling" circumstances that would support a sentence reduction at this point in time, particularly given that this information would have been available for consideration by the sentencing court had Mr. Mathis provided it, and given the agreed upon nature of Mr. Mathis's sentence.

## 2.  Charitable and Volunteer Work

In his Motion, Mr. Mathis outlines his extensive charitable service starting in 1984, including volunteering at group homes, participating in a mentorship program, volunteering in a hospital, and volunteering at the Special Olympics. (ECF No. 359, at 26–28.) The Government claims that Mr. Mathis's pre-conviction charitable activities do not amount to extraordinary and compelling circumstances because the activities occurred many years before Mr. Mathis started robbing banks and decades before he committed the bank robbery that most recently led him to this Court. (ECF No. 363, at 10.)

The Court agrees with the Government that Mr. Mathis's history of volunteer work does not rise to the level of extraordinary and compelling circumstances warranting a reduction of his sentence. While laudable activities, they substantially predate his 1994 and 2010 criminal conduct and convictions; are not, in the Court's judgment, substantially out of the ordinary; were available for consideration at the time of Mr. Mathis's sentencing and were presented to the sentencing court; and do not otherwise support a reduction or change in the lawfully imposed sentence in this case. After all, Mr. Mathis committed the serious and violent offense involved here even after he had engaged in such charitable endeavors, so that engagement would not appear to be some

predictor of constructive community conduct on his part, nor does it mitigate the severity of his offense conduct particularly coming as it does in the years before the crime of conviction here.

### 3.  History of Accepting Responsibility

Mr. Mathis outlines certain circumstances relative to a bank robbery he committed in 1994 and states that after he was arrested for that robbery, he told an FBI Special Agent that he was the person who committed five other bank robberies. (ECF No. 359, at 29.) Mr. Mathis takes the position that if he had not admitted to the FBI that he committed any one of those robberies, then they or it would have remained unsolved, and this fact should be accounted for when considering this Motion. (ECF No. 367, at 7.) Mr. Mathis requests this Court consider his prior admissions in 1994, the Government's conduct relative to them, and the lack of three-level reduction for acceptance of responsibility under the Sentencing Guidelines that he states that he was promised in the 2010 plea agreement.[2] (ECF No. 367, at 10.)

The Government, on the other hand, explains that Mr. Mathis's assertion that his admitting to a bank robbery or robberies of which he supposedly was not suspected of committing does not rise to an extraordinary and compelling circumstance because the FBI knew about the robberies, Mr. Mathis's admission was not motivated by remorse because it was made after his arrest for other robberies, and the terms of the plea agreement that Mr. Mathis agreed to required him to admit to the other robberies. (ECF No. 363, at 10.)

Even if the Court were to consider this asserted version of "acceptance of responsibility" as a factor to be considered now, Mr. Mathis's acceptance of responsibility as he has outlined it in

---

[2] As the Government accurately notes, given the mandatory and agreed upon nature of the sentence imposed, the existence of that three level "acceptance of responsibility" adjustment would have impacted the "math" of the Sentencing Guidelines, but would have not impacted the actual sentence. And it is important to recall that via his plea agreement, Mr. Mathis also avoided sentencing on other counts charged, including a count that carried an additional mandatory consecutive sentence of twenty-five (25) years in prison. Thus, the "loss" of the impact of such a three level downward Guidelines adjustment is at best theoretical.

his Motion does not rise to the level of an extraordinary or compelling circumstance. Again, while laudable conduct, it does not generate a reasoned basis to reduce his sentence. In essence, by this argument, Mr. Mathis seeks a "redo" of his sentencing in this case. That is not the purpose of a sentence reduction under § 3582, which is instead fundamentally intended to consider and grant relief for "extraordinary and compelling" circumstances that arise during the imposed custodial sentence. The fact that Mr. Mathis previously confessed to many other bank robberies is simply not "extraordinary and compelling" in a way that calls into question the importance of continued custody to community safety, or even the current health of Mr. Mathis. And, as noted above, the sentence Mr. Mathis seeks to reduce here was agreed to by him in a plea agreement that provided other quite substantial sentencing benefits to Mr. Mathis, all of which occurred at a time when both he and the United States were aware of whatever actions Mr. Mathis took to acknowledge his prior criminal conduct. Additionally, the Court notes that the reason Mr. Mathis did not receive the "benefit" of a three-level Sentencing Guidelines reduction was because of the mandatory and agreed upon nature of his imposed sentence now before the Court.

### 4. **Military Service**

Mr. Mathis argues that the Court should consider his military service when deciding his motion for compassionate release. Mr. Mathis served active duty in the Army for two years shortly after he graduated from high school. (ECF No. 359, at 31.) During his two years of such active service (1982–1984), Mr. Mathis earned several accolades. (*Id.* at 32.) After his two years of active service, he spent several years in the military reserves. (*Id.*) The Government argues that Mr. Mathis's military service should not be considered an extraordinary and compelling circumstance.

The Court concludes that Mr. Mathis's military service does not meet the standard for extraordinary and compelling circumstances warranting compassionate release. While it is

honorable conduct too rare in today's world, it does not have any specific relevance as to why Mr. Mathis's sentence should be reduced, and at best, is simply a request that this Court reconsider the sentence previously imposed in this case, especially since this military service was detailed in Mr. Mathis's sentencing memorandum provided to the sentencing judge as she considered whether to impose exactly the sentence Mr. Mathis had agreed to in writing via his plea agreement. Nor does the Court conclude that in these circumstances such service is so extraordinary or compelling so as to become a factor warranting sentence reduction, especially when the sentencing judge was well aware of it at the time of sentencing. And given that such military service was well before the crime of conviction here, the Court does not view it as mitigating the seriousness of Mr. Mathis's criminal conduct. In short, Mr. Mathis's military service occurring before his armed robberies is not an extraordinary and compelling circumstance counseling in favor of an early termination of his custodial sentence imposed for the violent crime involved here.

### 5.  Lamont LaPrade's Alleged False Statements

Mr. Mathis claims that after the arrest following the bank robbery committed by Mr. Mathis and Co-Defendant Lamont LaPrade, Mr. LaPrade made false statements to authorities, but that Mr. Mathis was "unconcerned" about the statements at the time such that he did not then challenge them. (ECF No. 359, at 32.) The main statement presently of concern to Mr. Mathis is Mr. LaPrade's allegedly false statement that Mr. Mathis wanted Mr. LaPrade to bring ammunition to Pittsburgh, thereby implying that Mr. Mathis already had the involved firearms with him since he only needed ammunition from Mr. LaPrade. (*Id.* at 33.) Additionally, Mr. Mathis asserts that the Government did not advance any evidence that suggested Mr. Mathis instructed Mr. LaPrade to bring firearms to Pittsburgh. (ECF No. 367, at 12.)

Mr. Mathis explains that this information is relevant because he now says that if *Mr. LaPrade* had simply not brought the firearms with him, the credit union robbery would have gone off differently and Mr. Mathis would have faced a lesser sentence for committing *unarmed* bank robbery. (ECF No. 359, at 37.) In essence, Mr. Mathis's logic appears to be that if Mr. LaPrade had not brought the guns involved *in* the robbery *to* the robbery that the two of them had planned in detail, he (Mr. Mathis) would not have shot a teller in the chest, would not have pistol-whipped another teller, would not have fired a gun into the wall, and would not have fired a gun in the direction of Credit Union patrons, all because he would not have had the gun he used to do those things.

There is a big problem with the faulty logic Mr. Mathis relies on—Mr. Mathis's position runs counter to the reality that *he* was the person responsible for his own violent criminal conduct by pulling the trigger on the gun *he* was possessing. The fact that Mr. LaPrade (Mr. Mathis says) was alleged by him to be the one that brought the guns to the scene does not diminish that responsibility. Mr. Mathis was not compelled to possess the gun, to point the gun, to use the gun as a club, or to shoot the gun. He did those things, not Mr. LaPrade (at least not as to the 9 millimeter handgun Mr. Mathis used). Mr. Mathis's decision to do those things was an intervening event in the chain between Mr. LaPrade supposedly giving him the gun, and Mr. Mathis using it. For that he, and not Mr. LaPrade, is responsible.

The Government further explains that this is not an extraordinary and compelling circumstance because Mr. Mathis offers no objective evidence to support his claims in these regards and it is contrary to the record because in each of his many other bank robberies except for one, Mr. Mathis had personally discharged a firearm. (ECF No. 363, at 12.) More directly, the Government's position is that Mr. Mathis's argument in these regards is belied by the overall

record, since Mr. Mathis had repeatedly fired his gun during his prior bank robberies making it his "standard robbery procedure." Additionally, the Government reminds the Court that the presiding judge during Mr. Mathis's sentencing simply did not believe Mr. Mathis when he stated that the first gunshot he fired in the bank, and which struck the teller in the chest after passing through a computer screen, was an accident. (*Id.*)

Even if Mr. LaPrade's statements were false and the Government incorrectly relied on them, the Court nonetheless concludes that these circumstances would not rise to the level of extraordinary and compelling circumstances warranting a sentencing reduction. Mr. Mathis used a firearm to personally shoot a teller and to personally pistol-whip a second employee, to personally pump bullets into the ceiling, and to then personally fire at arriving Credit Union patrons. The Court concludes that Mr. Mathis's argument that "if only" Mr. LaPrade had not brought the firearms, Mr. Mathis would have faced a lesser sentence for only committing *unarmed* bank robbery is wholly unconvincing. And, of course, Mr. Mathis could have avoided the "armed bank robbery" charge by either not robbing the credit union at all, or by simply leaving the pistol, whatever its source, at home. He chose neither path.

Mr. Mathis blaming Mr. LaPrade for his own decisions to fire a gun during the most recent armed robbery strikes the Court as bordering on the absurd and is a position that fundamentally demonstrates a lack of acceptance of responsibility on Mr. Mathis's part. Additionally, the Court further acknowledges that the sentencing judge in Mr. Mathis's case simply did not find credible his statement that the gun he possessed and used was accidentally discharged, sending a bullet into the chest of a teller.

**6.  Alleged Aggravated Assault by State Law Enforcement Authorities**

Mr. Mathis claims that when he was stopped and arrested in a shopping mall shortly after

17

he committed the latest robbery, a law enforcement officer kicked him in the head, breaking his eyeglasses, after he was already detained. (ECF No. 359, at 39.) He also asserts that he has provided sufficient evidence to support this assertion through a sworn declaration. (ECF No. 367, at 14.) The Government claims that there is no objective evidence that Mr. Mathis was assaulted at all. (ECF No. 363, at 13.)

Even if what Mr. Mathis asserts is true, the Court concludes that this does not rise to the level of an extraordinary and compelling circumstance supporting sentence reduction. While it would be an unfortunate and wholly inappropriate event, any such mistreatment by law enforcement at the time of his apprehension could have and should have been addressed in other legal forums by Mr. Mathis. In the Court's judgment, none of this is an extraordinary and compelling basis for sentence reduction.

### 7. Claims of Systemic Inequality

Mr. Mathis asserts that systemic inequality plays a role in his case because the Government could have charged him for offenses with an offense level that would have allowed for a lower advisory Sentencing Guidelines range. (ECF No. 359, at 46.) To support his assertion that the Government chose to prosecute this case with his race as a motivating factor, Mr. Mathis points mainly to the case of *United States v. Korbe*, No. 12-1803, 2013 WL 791612 (W.D. Pa. Mar. 4, 2013), in which he posits that a defendant from a predominantly white and affluent area committed a more serious crime resulting in a lesser sentence than Mr. Mathis received. (ECF No. 359, at 47–48.)

The Government takes the position that Mr. Mathis does not offer any evidence that his race was a factor in the decision of his case beyond his bald reference to the *Korbe* case. (ECF No. 363, at 14.) The Government also asserts that Mr. Mathis ignores the role his own conduct of being

a federal supervised releasee robbing a bank and discharging a firearm and shooting another person played in its charging decisions. (*Id.*)

"In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996). For Mr. Mathis to successfully assert this, he would need to show that "similarly situated individuals of a different race were not prosecuted." *Id.*  While Mr. Mathis cites to *Korbe*, he offers no objective evidence to suggest that the Government's decisions while prosecuting his own case related to his race rather than to his own violent conduct here and in the past, and his reliance on statistics from the Sentencing Commission from nearly a decade *after* his offense conduct simply misses the mark.

His argument also fails to address the reality that he brought to the prosecution and sentencing process here a stark record of repetitive violent conduct involving a long string of armed robberies, coupled with the calculated and calculating nature of his actions relative to this one, not to mention his return to gunplay as he carried it out here and in his five prior robberies, with an overlay of express death threats to tellers, and the pistol whipping of one of them. The Court concludes that this one-off comparison by Mr. Mathis to another case with no detailed indicia of comparability presented beyond the difference in the races of defendants does not fit the bill for a racially discriminatory prosecution or sentencing claim and does not even shift the burden to the Government to rebut his assertions. He simply has not presented evidence sufficient to make this claim rise to the level of "extraordinary and compelling," or make it any more than the product of his own speculation.

8. **Asserted Long-Term Health Issues**

Mr. Mathis asserts that he has three long-term health challenges: 1) prolonged radiation exposure over thirty years; 2) high cholesterol that is not properly treated; and 3) the BOP's failure to treat his chronic kidney disease. (ECF No. 367, at 17.)

First, regarding the radiation exposure, Mr. Mathis explains that when he was enlisted in the Army in 1982, a doctor informed Mr. Mathis that he was allergic to the tuberculosis (TB) tine test and would be required to receive annual x-rays in lieu of the test. (ECF No. 359, at 49.) It was not until 2013 that Mr. Mathis discovered he was not actually allergic to the test. (*Id.* at 50.) Mr. Mathis asks this Court to account for the *possibility* of his developing cancer from the radiation exposure from x-ray screening as support for his Motion. (*Id.*)

Second, Mr. Mathis explains that his high cholesterol is not controlled because it exceeds 200 mg/dl and there is an indication that Mr. Mathis suffers from kidney disease. (ECF No. 367, at 18.) Mr. Mathis claims that he was previously able to keep his high cholesterol at bay with a healthy diet and regular exercise, but the lockdowns in FCI Herlong during the COVID-19 pandemic prevented him from having sufficient control over his diet and exercise. (ECF No. 359, at 51–52.) Mr. Mathis explains that when he received this information, he was told that he needed quarterly blood tests and a follow-up appointment with a doctor and neither of these events has occurred. (ECF No. 367, at 18.)

Third, Mr. Mathis claims that a medical professional who examined him while in BOP custody told him that he had kidney damage, which he (Mr. Mathis) claims led to chronic kidney disease requiring routine tests. (ECF No. 359, at 52–53.) However, Mr. Mathis asserts that he has not received the testing that is required to monitor his condition while in BOP custody. (*Id.*) Further, Mr. Mathis claims that the medication he is taking for his cholesterol is damaging to his

kidneys and is unhelpful for his cholesterol as well, but the doctor who treated him while in BOP custody did not explore an alternative course of treatment. (*Id.* at 55.) Mr. Mathis claims that his kidney condition, when put in conjunction with the other factors he presents, rises to the level of extraordinary and compelling circumstances. (ECF No. 367, at 19.)

The Government argues that Mr. Mathis's medical records lack support for his medical claims, and, essentially, that Mr. Mathis asks the Court to accept his self-diagnosis of excessive radiation exposure. (ECF No. 363, at 16.) The Government acknowledges that the medical records show Mr. Mathis's slightly elevated cholesterol and his estimated glomerular filtration rate of fifty-seven (57), which, Mr. Mathis explains, suggests chronic kidney disease if persistent. (*Id.*) However, the Government emphasizes that Mr. Mathis did not present evidence that he is not receiving treatment for these conditions. (*Id.*) Overall, the Government argues that because Mr. Mathis has received the COVID-19 vaccine and there is no evidence that he is not receiving medical treatment for his other conditions, his medical condition(s) do not rise to the level of extraordinary and compelling circumstances. (*Id.*)

This Court has considered the medical records tendered by the parties. It first concludes that Mr. Mathis's claim of overexposure to radiation years ago and then supposedly more recently is not sufficient to warrant classification of that situation as being extraordinary and compelling, especially given the fact that Mr. Mathis presents nothing to suggest that this asserted excess radiation has caused any adverse effect on his health, or that such is in any relevant way related to the duration of his BOP sentence and custody. While the elevated cholesterol and chronic kidney conditions are potentially medically serious and could be "extraordinary and compelling" if combined with other extraordinary and compelling factors and perhaps if they were significant and persistent over time while being unresponsive to treatment, no such factors are applicable here.

21

And based on the Court's review of the involved medical records, the degree of Mr. Mathis's afflictions appears to the Court to be barely out of the ordinary when considered in any objective medical sense, and Mr. Mathis's assertions as to these medical conditions are at this point simply too vague and uncertain to support a reduction in his imposed sentence.

### 9.  **Mr. Mathis's Claim of Exceptional Performance in Prison**

While recognizing that rehabilitation alone is not an extraordinary and compelling circumstance under § 3582(c)(1)(A)(i), Mr. Mathis argues that the Court can, and should, consider it "with other equitable factors" to determine whether extraordinary and compelling circumstances warrant the relief he seeks. Mr. Mathis maintains that for his period of incarceration for the instant offense, he has only received one negative incident report. (ECF No. 367, at 20.) Additionally, Mr. Mathis tells the Court that while in prison he has earned two college degrees, earned a post-graduate certificate from Adams State College and a paralegal diploma from Blackstone Career Institute, has published four books, volunteered to help other inmates in their earning degrees, and has assisted other inmates in their legal cases. (ECF No. 367, at 20.) Further, Mr. Mathis claims that he has received positive evaluations as a GED tutor and as an Adult Continuing Education ("ACE") volunteer in the Education Department at FCI Herlong. (ECF No. 359, at 58.) Also, Mr. Mathis states that the BOP has recognized Mr. Mathis's positive transformation while incarcerated by reducing his security level of custody to "medium" and giving him a "low rate of recidivism" factor. (ECF No. 359, at 63.) Mr. Mathis argues that his rehabilitation combined with his other circumstances amount to extraordinary and compelling circumstances warranting a release from institutional custody and imposition of a special term of supervised release in its stead. (ECF No. 359, at 59.)

The Government disagrees with Mr. Mathis's statements that these are extraordinary and compelling factors and argues that he has displayed a poor record in prison stemming all the way back to 1996. (ECF No. 363, at 17.) Further, it asserts that Mr. Mathis's most recent disciplinary infraction was in 2020 and should be treated as being at best a reflection of only his most current conduct in custody. The Government also points out that Mr. Mathis was charged and convicted with a federal crime for possession of contraband in his cell, which turned out to be a quantity of sturdy fabric that he was in the process of using to attempt to fabricate a hang glider to facilitate his escape. That offense yielded a standalone federal sentence of eighteen (18) months of further custody.

The Court concludes that participating in activities and programs provided to him in prison does not make Mr. Mathis's rehabilitation rise to the level of being extraordinary and compelling, even when taken in conjunction with the other circumstances that Mr. Mathis presents in his Motion. Even if the Court were to conclude that Mr. Mathis's commendable efforts at rehabilitation were extraordinary and compelling, "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for granting his Motion, 28 U.S.C. § 994(t), and the other circumstances that Mr. Mathis argues in his Motion to justify his request for sentence reduction fall far short of being extraordinary and compelling considered separately from rehabilitation or in combination with it. After all, the sentencing memorandum presented to Judge Ambrose at the time of sentencing revealed that when Mr. Mathis committed the robbery at issue here, he was an educated person who had served in the military, had engaged in community service, and had otherwise pursued constructive activities as part of his daily living. And, still, he committed the violent robbery at issue here. His rehabilitative activities have not been a sound predictor of his future conduct.

10. <u>Withholding of First Step Act Credits</u>

Mr. Mathis acknowledges that Congress barred certain inmates from receiving First Step Act time credits, but he argues that this does not preclude a District Court from considering such credits during a sentencing, relying on *Concepcion v. United States*, 142 S. Ct. 2389, 2404 (2022). (ECF No. 367, at 23.)

The Government disagrees with Mr. Mathis by stating that under 18 U.S.C. § 3632(d)(4)(D)(xxii), Congress decided that those convicted under 18 U.S.C. § 924(c)(1) do not have eligibility for special time credits under the First Step Act. (ECF No. 363, at 18.)

18 U.S.C. § 3632(d)(4) provides that an eligible prisoner who successfully completes evidence-based recidivism reduction programming or productive activities shall earn time credits as specified in 18 U.S.C. §§ 3632(d)(4)(A)(i)–(ii). The Court concludes that Mr. Mathis's argument fails because, under the plain language of the statute, Mr. Mathis is not eligible for this credit.

18 U.S.C. § 3632(d)(4)(D) explains circumstances where time credits cannot be given. It reads: "A prisoner is ineligible to receive time credits under this paragraph if a prisoner is serving a sentence for a conviction under . . . Section 924(c), relating to unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 3632(d)(4)(D)(xxii).

Mr. Mathis's instant offense falls under § 924(c). The Court concludes that since Mr. Mathis is ineligible to receive these special First Step Act credits by statute, the Court need not (and should not) analyze whether the withholding of such credit should be considered extraordinary and compelling circumstances for these purposes, and *Concepcion* does not compel it to do so. *See United States v. Gordon*, No. 22-1853, 2022 WL 14365245, at *1 (3d Cir. Oct. 25,

2022); *United States v. Lewis*, No. 22-2190, 2022 WL 4546859, at *1 (3d Cir. Sept. 29, 2022); *United States v. Hall*, No. 22-2152, 2022 WL 4115500, at *2 (3d Cir. Sept. 9, 2022); *United States v. Bledsoe*, No. 22-2022, 2022 WL 3536493, at *2 (3d Cir. Aug. 18, 2022) (each stating that *Concepcion* does not impact the compassionate release calculus by requiring the consideration of factors made inapplicable by statute).[3] And beyond that, even if this factor were permissibly considered by the Court here, the fact that Mr. Mathis would not be receiving those credits does not in the Court's judgment make such to be extraordinary and compelling circumstances warranting a sentencing reduction, particularly since such was the outcome resulting from the application of the plain language of that statute.

### 11. Conditions of Confinement

Mr. Mathis argues that the sentence he is serving is harsher than what was contemplated at the time of sentencing. (ECF No. 367, at 24.) Mr. Mathis has experienced restrictions due to total lockdowns related to COVID-19 such as reductions in educational programming, decreased work activities, and suspension of family visits. (*Id.*) The worst condition, Mr. Mathis asserts, is that he was in his cell when smoke from the wildfires around FCI Herlong infiltrated the prison. (*Id.*) Mr. Mathis believes that each of these conditions, when taken together, amount to extraordinary and compelling circumstances. (*Id.*)

The Government disagrees and explains that since Mr. Mathis acknowledges that the complaints he has are institutional-wide and not directed at him, they cannot be extraordinary and compelling and are rather simply conditions created due to a pandemic. (ECF No. 363, at 19.) The

---

[3] The Court recognizes that each of these decisions is nonprecedential and therefore not controlling Circuit precedent. But their consistency and recency along with their reasoning is some considerably persuasive authority for the Court's proceeding as it does here. As such, the Court does not apply the analysis of *United States v. Chen*, 48 F.4th 1092, 1099–1100 (9th Cir. 2022), which applied *Concepcion* in this context and called our Circuit's decision in *Andrews* into question post-*Concepcion*.

Government also argues that Mr. Mathis has not provided evidence that the smoke from the wildfires generated any actual harm to him. (*Id.*)

The Court concludes that while the fact that such matters impacted the entire BOP institution does not preclude the Court's considering them in the context of a compassionate release motion, Mr. Mathis's conditions as he has presented them, while challenging, do not amount to extraordinary and compelling circumstances and he has not asserted that it is necessary for him to have a reduced sentence, or a term of special supervised release, because of conditions that had passed at the time he filed his Motion, nor in the Court's judgment do they fall so outside of the range of reasonableness so as to be extraordinary and compelling circumstances for these purposes.

### C.  The § 3553(a) Factors

Finally, the Court must consider whether release of Mr. Mathis is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. 2020).

In addition, the Third Circuit has affirmed that the determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F. 3d 327 (3d Cir. 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 2020 WL 4281503, at *2.

26

Here, Mr. Mathis argues that his post-offense conduct has been excellent and believes that because of his maturity, he requires less time in prison to reduce future dangerousness. (ECF No. 359, at 80; ECF No. 367, at 25.) Also, Mr. Mathis asserts that even though his offense conduct was serious, he has already served a lengthy amount of time in BOP custody. (ECF No. 359, at 81.) Additionally, Mr. Mathis argues that he will not be a threat to society as evidenced by his plan to move in with his brother should he be given compassionate release, his age at time of release if the Motion is granted (age sixty-three (63)), and his capabilities to hold employment allowing him to work from home. (ECF No. 359, at 82; ECF No. 367, at 26–27.) Further, Mr. Mathis asserts that based on the BOP's Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN"), his score is "low" indicating his low risk for recidivism. (ECF No. 367, at 29.)

The Government argues that Mr. Mathis's assertion that he has had excellent post-offense conduct is an overstatement and discounts Mr. Mathis's misconduct while in prison (including a conviction for the possession of contraband to be used for a possible escape). (ECF No. 363, at 20.) The Government emphasizes that Mr. Mathis's most recent infraction in prison occurred only in 2020. (*Id.*) Additionally, the seriousness of the crime Mr. Mathis committed, and his criminal history, lead the Government to argue against compassionate release. (*Id.*)

Even if the Court found that Mr. Mathis presented one or more extraordinary and compelling circumstances in support of his Motion, the Court nonetheless concludes that those circumstances would be substantially outweighed by the Section 3553(a) factors, specifically "the nature and circumstances of the offense and the history and characteristics of the defendant," and the seriousness of his offense conduct, along with the need to both protect the public from further criminal conduct by Mr. Mathis and to deter him from further such conduct.

The instant offense was Mr. Mathis's sixth bank/credit union robbery. He previously served fifteen (15) years in prison for the same offense and then proceeded to commit this crime within only one year of his release. He was of a mature age when he did so, shooting another person, and shooting at other persons, in the process. These were not crimes of immaturity, nor were they "one off" or spur of the moment events of unlikely recurrence. Mr. Mathis is an educated man who has displayed considerable planning and reasoning skills. His conviction record demonstrates that he is also quite capable of being an extraordinarily violent person who has repeatedly terrorized bank tellers and customers with his active use and discharge of guns during robberies, and his credible threats to kill those that get in his way, involving his use of guns in making those threats. His record does not reveal successful and productive efforts to depart from that path, and in fact, upon his release from his most recent prior stint in federal prison for armed robbery, his next and quickest move was to plan his next armed robbery with a newly found recidivist accomplice. The long prison sentence imposed in his case resulted from  Mr. Mathis's own horrific unlawful conduct, was agreed to by him in his plea agreement, and none of the bases for sentence reduction proposed by Mr. Mathis, singularly or together, warrant any reduction in that sentence. Mr. Mathis is exactly where his own violent criminal conduct warrants him being and remaining for the duration of his imposed sentence.

Overall, there is not  credible evidence advanced that persuades the Court that Mr. Mathis would not be a danger to the community if the Court were to grant this Motion and reduce his sentence, nor would the resulting sentence promote respect for the law and reflect the seriousness of the offense conduct in which he engaged. The record here convinces the Court of exactly the opposite.

IV.     **<u>CONCLUSION</u>**

Having carefully considered the parties' briefing on Mr. Mathis's Motion for Release/Reduced Sentence and having concluded that the record lacks a showing of extraordinary and compelling reasons to grant it, the Court DENIES Mr. Mathis's Motion without prejudice.

An appropriate Order will issue.


                                                    <u>s/ Mark R. Hornak</u>
                                                    Mark R. Hornak
                                                    Chief United States District Judge


Dated:          December 13, 2022
cc:             Mr. David Mathis (via U.S. Mail)